USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 06/23/2023

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                                                                  :
UNITED STATES OF AMERICA,                                         :
                                                                  :
                              -against-                           :            22-CR-425 (VEC)
                                                                  :
                                                                  :            OPINION AND ORDER
CHINWENDU ALISIGWE,                                               :
                              Defendant.                          :
                                                                  :
------------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

Chinwendu Alisigwe ("Mr. Alisigwe") is charged with conspiracy to commit bank fraud,

bank fraud, and aggravated identity theft. The Government alleges that he opened bank accounts

using fake forms of identification and withdrew funds that were the proceeds of fraud from those

accounts. See Compl., Dkt. 1; Indictment, Dkt. 5. After Mr. Alisigwe indicated during a status

conference that he wishes to present an affirmative defense of duress at trial, the Government

moved for a pretrial evidentiary hearing regarding the anticipated defense and a pretrial ruling

regarding whether Mr. Alisigwe has made a sufficient threshold showing that he is entitled to

present the defense at trial. See Gov't Mot., Dkt. 35. The Court held an evidentiary hearing on

May 30, 2023.[1] For the following reasons, Mr. Alisigwe is precluded from presenting a duress

defense at trial.

---

[1]     Mr. Alisigwe joined the Government's request for an evidentiary hearing. See Def. Response, Dkt. 45.
The Court therefore granted the request without deciding whether the Government would have been entitled to an
evidentiary hearing had Mr. Alisigwe opposed the request. See United States v. Paul, 110 F.3d 869, 871 (2d Cir.
1997) (noting that it is "appropriate for a court to hold a pretrial evidentiary hearing to determine whether a defense
fails as a matter of law"). Only Mr. Alisigwe testified at the evidentiary hearing.

## BACKGROUND[2]

Mr. Alisigwe was born and raised in Orlu, Nigeria.  May 30, 2023 Transcript ("Tr.") at 3:20–4:9.  His mother, who is around 70 years old, still lives in Orlu and suffers from hypertension.  *Id.* at 6:1-9, 11:11-12.

In 2008, after winning the visa lottery, Mr. Alisigwe moved to the United States.  *Id.* at 12:12-24.  About seven or eight years later, Mr. Alisigwe first became involved in the activities that are the subject of the Indictment in this case.  *Id.* at 16:7–17:9.  At some point in 2015, Mr. Alisigwe received a phone call from a stranger seeking to do business with him.  *Id.* at 17:8–18:11.[3]  Mr. Alisigwe thought that the stranger was perhaps seeking help to purchase a car in the United States, which was a common request from people in Nigeria.  *Id.* at 18:4-10.  Mr. Alisigwe testified that he never knew how the stranger obtained his number.  *Id.* at 70:21–71:1.

About a week later, the stranger called back and said that he wanted Mr. Alisigwe to provide bank account information so the stranger could wire money to the account.  *Id.* at 18:12-18.  Mr. Alisigwe refused his request.  *Id.* at 18:20-21.

About six months later, the stranger called again and said that Mr. Alisigwe would soon be receiving a call from a number identified as "call-1."  *Id.* at 18:25–19:6.  The stranger told Mr. Alisigwe that he wanted Mr. Alisigwe to open bank accounts for him.  *Id.* at 19:7-12.  Mr. Alisigwe refused and asked the stranger to identify himself.  *Id.*  The stranger declined to do so and told Mr. Alisigwe that he was from the same place as Mr. Alisigwe.  *Id.* at 19:10-13.

---

[2]     The Court construes the evidence presented at the evidentiary hearing in the light most favorable to Mr. Alisigwe for the purposes of this decision.  *See United States v. Villegas*, 899 F.2d 1324, 1345 (2d Cir. 1990).

        The parties agreed that Mr. Alisigwe's statements during the hearing will be admissible as impeachment evidence but not as direct evidence in the Government's case in chief.  *See* May 30, 2023 Transcript ("Tr.") at 2:13–3:3; *cf. Simmons v. United States*, 390 U.S. 377, 393–94 (1968) (holding that the Government may not establish a defendant's guilt at trial by using testimony the defendant gave at a pretrial suppression hearing).

[3]     The stranger allegedly knew Mr. Alisigwe's name but did not disclose his own name.  Tr. at 17:21–18:4.

In early 2016, after a trip to Nigeria during which he did not meet the stranger who had been calling, *id.* at 20:3-6, Mr. Alisigwe's father died; he received a photograph of his mother via text message from the stranger, *id.* at 20:7-19. The stranger told Mr. Alisigwe said that he knew his mother and that his father had recently died. *Id.* at 20:19-23. The stranger said he would not "do anything" to his mother so long as Mr. Alisigwe opened a bank account, with further instructions to follow. *Id.* at 20:23–21:5.

A week later, the stranger texted Mr. Alisigwe another photograph of his mother. *Id.* at 21:12-15. In a subsequent call when Mr. Alisigwe pressed for an explanation for how the stranger had images of Mr. Alisigwe's mother, *id.* at 21:16–18, the stranger responded:

> [W]e know everything about you and your family. So just listen to me, and do as I say, and nobody will get hurt. Nothing will happen to you to your mom. We know your father is dead. If your mom die[s], I don't think you will be able to come back home. And after your mom, we will come after your family. We know everybody in your family.

*Id.* at 21:19-24. Mr. Alisigwe then agreed to open a bank account. *Id.* at 21:25–22:1.

One month later, Mr. Alisigwe received by mail a package containing a cellphone, directions (including a telephone number at which the stranger could be reached), and a list of approximately three names. *Id.* at 22:2-15, 23:7-11. The stranger told Mr. Alisigwe to buy a SIM card and to call him at the number provided in the package. *Id.* at 22:11-15. When Mr. Alisigwe called the phone number, the stranger answered and instructed Mr. Alisigwe to review the instructions provided in the package, memorize the list of names he had provided, and not to give the stranger's telephone number to anyone. *Id.* at 22:20–23:4.

The next time the stranger called, he asked Mr. Alisigwe for a photograph of himself; shortly thereafter, Mr. Alisigwe received passports in the mail featuring his photograph but the names of other people. *Id.* at 23:21–24:13. Mr. Alisigwe was instructed to open accounts using

the passports within two days of receipt so that the stranger could wire money into the accounts. *Id.* at 23:21–24:13, 44:12–49:11.  Mr. Alisigwe misrepresented his identity to withdraw funds from these accounts.  *Id.* at 51:25–53:7.

A different stranger would routinely meet Mr. Alisigwe in a park in New York to give him new phones and to collect the cash Mr. Alisigwe had withdrawn from the accounts.  *Id.* at 44:12–45:25, 48:15–49:11.  Mr. Alisigwe was allowed to keep some of the cash to buy new phones or to purchase whatever he wanted.  *Id.* at 46:22–47:7; 69:6-14.

At one point, when Mr. Alisigwe was having lunch at a restaurant in Nigeria, the men with whom he had been dealing appeared in two vehicles and ordered Mr. Alisigwe to continue following their instructions and to always answer the phone when they called.  *Id.* at 24:22–25:11.  According to Mr. Alisigwe, this was the only time he met the men who had threatened to harm his family if he did not work with them.  *Id.* at 41:23–42:14.

Mr. Alisigwe did not contact the Nigerian police because he believed they would not do anything to help him, especially if they became aware that the people threatening him were armed and dangerous.  *Id.* at 24:14–25:25, 66:21-23.[4]  Mr. Alisigwe was also concerned that if the people who were threatening him found out that he had reported them to the police, they would harm his mother.  *Id.* at 26:1-20.  Mr. Alisigwe was particularly concerned when he learned that his mother had met the people who were threatening him and that she thought they were his friends from the United States.  *Id.*

---

[4]     According to Mr. Alisigwe, the police in Orlu are not reliable because they only attend to politicians and because members of violent militia groups sometimes pose as police officers.  *Id.* at 6:13–8:12, 9:14-23.  Ostensible police officers may, for example, stop a motorist and threaten the driver at gunpoint until they are paid a bribe.  *Id.* at 9:2–10:9.  Police officers in Orlu also purportedly arrest anyone with a laptop or an iPhone and hold them until a bribe is paid.  *Id.* at 10:10–11:1.

Mr. Alisigwe did not contact law enforcement in the United States because he was afraid that doing so would prevent him from complying with the stranger's orders; if he no longer complied, his mother would be killed.  *Id.* at 26:21–27:13, 66:16-20.

Whenever Mr. Alisigwe told the stranger that he no longer wanted to participate in illegal activity, he would receive threats to his mother's life, and eventually threats to the lives of his wife and children.  *Id.* at 27:14-22.  Mr. Alisigwe never told his mother about these threats because he was concerned that doing so would scare her badly, possible leading to a heart attack or other adverse health consequences.  *Id.* at 39:19–40:14.  Although Mr. Alisigwe tried to move his mother to another location to protect her, she refused to move.  *Id.* at 40:20–41:11.

Mr. Alisigwe therefore continued to engage in illegal activity for several years.  *Id.* at 28:5-8.  He never learned the names of the individuals who were threatening him, but consistently received phone calls from them, sometimes as frequently as three times a week.  *Id.* at 27:23–28:4; 36:4-13.

On February 7, 2019, Mr. Alisigwe flew into JFK Airport from Nigeria.  *Id.* at 28:9-15.  At the airport, Mr. Alisigwe was stopped and interviewed by FBI agents.  *Id.* at 28:19–32:16.  Over the course of the interview, Mr. Alisigwe realized that the FBI suspected him of engaging in identity theft.  *Id.* at 33:2-4; 64:19–65:1.  He did not tell the FBI agents that he was being threatened because he was afraid of what would happen in Nigeria.  *Id.* at 65:2-9.  Shortly thereafter, Mr. Alisigwe told the men who were threatening him that he no longer wished to cooperate because he was afraid of being apprehended, and stopped answering their phone calls for about two months.  *Id.* at 33:5-19.  He then received another photograph of his mother, which prompted him again to cooperate with the strangers.  *Id.* at 33:19–34:7.[5]

---

[5]     Mr. Alisigwe was interviewed by U.S. Customs and Border Protection officers a few years later; he again did not report that he was being threatened by people in Nigeria.  *Id.* at 65:12–66:4.

Mr. Alisigwe engaged in the illegal activity at issue for approximately five years.  *Id.* at 67:8-10.  He did not report the threats against him to law enforcement when he was arrested in this case.  *Id.* at 71:9–72:21.  Although Mr. Alisigwe was concerned that his mother would be at risk because he could no longer respond to calls from the stranger after he was arrested, he believed that the men who were threatening him were aware of his arrest through voodoo.  *Id.* at 72:13–74:8.

Mr. Alisigwe first informed the Court of the threats on February 24, 2023, when, during a guilty plea proceeding, the Undersigned asked him whether he had been forced to commit any of the crimes to which he was pleading guilty.  *Id.* at 34:10–35:17; *see also* Order, Dkt. 34.  Before that point, Mr. Alisigwe had not reported the threats to anyone other than his wife.  Tr. at 40:15-19, 66:24–67:4.

## DISCUSSION

### I.    Legal Standard

"Duress is a legal excuse for criminal conduct if, at the time the conduct occurred, the defendant was subject to actual or threatened force of such a nature as to induce a well-founded fear of impending death or serious bodily harm from which there was no reasonable opportunity to escape other than by engaging in the unlawful activity."  *United States v. Paul*, 110 F.3d 869, 871 (2d Cir. 1997) (internal quotation marks and citations omitted).

To be entitled to present a duress defense charge at trial, a defendant must "raise a factual issue regarding each element of the defense."  *Id.* (citation omitted); *see also United States v. Villegas*, 899 F.2d 1324, 1343 (2d Cir. 1990) (explaining that a defendant is entitled to a duress defense at trial if he "can make a prima facie showing as to each of the elements" of the defense).

If the defendant's evidence, "even if believed, fails to establish all of the elements of a duress defense," the Court may rule upon the defense as a matter of law and need not submit it to a jury.  *United States v. Bifield*, 702 F.2d 342, 346 (2d Cir. 1983).  If, however, the defense has "any foundation in the evidence," no matter how "weak or incredible," the defense must be charged to a jury.  *United States v. Urlacher*, 979 F.2d 935, 938 (2d Cir. 1992).

The elements of a duress defense are: "(1) a threat of force directed at the time of the defendant's conduct; (2) a threat sufficient to induce a well-founded fear of impending death or serious bodily injury;[6] and (3) a lack of a reasonable opportunity to escape harm other than by engaging in the illegal activity."  *United States v. Gonzalez*, 407 F.3d 118, 122 (2d Cir. 2005).

## II.    Mr. Alisigwe Has Failed to Make a Prima Facie Showing of Duress

Because Mr. Alisigwe has not proffered adequate evidence that he lacked a reasonable opportunity to escape harm to his family other than by engaging in illegal activity, he has failed to make a prima facie showing of duress.  Accordingly, he is not entitled to raise the defense at trial.[7]

Mr. Alisigwe engaged in the illegal conduct that gave rise to the Indictment for approximately five years.  *See* Tr. at 67:8-10.  He was approached by U.S. law enforcement in connection with this illegal conduct at least twice.  *Id.* at 28:16–33:4, 64:19–65:9, 71:9–72:21.  At no point during this extended period of illegal conduct, however, did Mr. Alisigwe report the threats against his family to any law enforcement officers, whether in Nigeria or in the United States.  *Id.* at 65:2-9–66:4; 71:9–72:21.  That alone is fatal to his duress defense.  *See United*

---

[6]     Evidence that a defendant's family has been threatened may be sufficient to establish the defense.  *See United States v. Bakhtiari*, 913 F.2d 1053, 1057 (2d Cir. 1990) (citing *United States v. Contento–Pachon*, 723 F.2d 691, 694 (9th Cir. 1984)).

[7]     Because Mr. Alisigwe has failed to make a prima facie showing with respect to the third element of duress, the Court does not decide whether he has made adequate showings with respect to the first two elements.

*States v. Bakhtiari*, 913 F.2d 1053, 1057–58 (2d Cir. 1990) (concluding that a defendant whose Iranian family was purportedly at risk of danger at the hands of "unidentified Iranians" if the defendant refused to commit certain criminal acts was not entitled to raise a duress defense at trial because the defendant "never communicated the alleged threats to any federal, state or local law enforcement authority"); *United States v. Alicea*, 837 F.2d 103, 105–07 (2d Cir. 1988) (concluding that even though "threats were made" against defendants' families in New Jersey, they were not entitled to present duress defenses at trial because there was "no evidence" that defendants "made any attempt either to seek protection from the authorities for their families or to telephone a warning directly to their relatives when they had an opportunity to do so").

Mr. Alisigwe emphasized during the evidentiary hearing that he did not report the threats against his family to Nigerian law enforcement because Nigerian police officers cannot be trusted. *See* Tr. at 24:14–25:25; 66:21-23.  That does not rescue a duress defense.  Any issues with Nigerian police did not prevent Mr. Alisigwe from reporting the threats against his family to law enforcement in the United States.  *See Bakhtiari*, 913 F.2d at 1058 (dismissing the defendant's argument that he did not have a reasonable opportunity to escape threats to his family in Iran because approaching U.S. law enforcement "would have served no purpose"; the defendant, unlike his family, was based in the United States, and therefore could have sought help from U.S. authorities); *United States v. Subhan*, No. 99-CR-1149 (HB), 2000 WL 1738665, at *1–3 (S.D.N.Y. Nov. 22, 2000) (concluding that the defendant, who asserted that his son had been kidnapped by "unknown individuals" in Pakistan who required the defendant to cooperate with them, was not entitled to present a duress defense at trial because, even assuming that "the Pakistani police were corrupt," the defendant's "failure to report his plight to the U.S. authorities preclude[d]" a duress defense).

Mr. Alisigwe insisted that contacting U.S. authorities was also out of the question because doing so would have prevented him from cooperating with the men who were threatening him, which could have led to his mother's death.  *See* Tr. at 26:21–27:13.  That argument fails because Mr. Alisigwe's subjective fears about the consequences of contacting U.S. law enforcement are insufficient to excuse compliance with this element of a duress defense.  *See Alicea*, 837 F.2d at 105–07 (concluding that defendants were not entitled to present a duress defense because they failed to seek help from law enforcement despite their "constant terror" of being apprehended by their abductors if they tried to seek help); *cf. United States v. Nwoye*, 663 F.3d 460, 464 (D.C. Cir. 2011) (concluding that a defendant was not entitled to present a duress defense because she failed to seek help from law enforcement even though she "was especially vulnerable as a recent immigrant who believed her fate was in the control of a corrupt law enforcement agent" and therefore hesitated to seek help).

For all of those reasons, the Court concludes that Mr. Alisigwe has failed to make a prima facie showing of duress.  He is therefore precluded from raising a duress defense at trial.

## CONCLUSION

The parties must appear for a status conference on **Monday, July 10, 2023 at 10 A.M.** in Courtroom **443** of the Thurgood Marshall United States Courthouse, located at 40 Foley Square, New York, New York 10007.  The parties must be prepared to discuss a trial schedule at the conference.  The Clerk of Court is respectfully directed to close the open motion at Dkt. 35.

**SO ORDERED.**

Date:  June 23, 2023
New York, NY

**VALERIE CAPRONI**
**United States District Judge**