UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                       :

UNITED STATES OF AMERICA          :

                                       :

        - v -                :               22 Cr. 425 (VEC)

                                       :

CHINWENDU ALISIGWE,            :

                                       :

                     Defendant.    :

                                       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

 

**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN
OPPOSITION TO DEFENDANT CHINWENDU ALISIGWE'S PRE-TRIAL MOTIONS**

 

                                  DAMIAN WILLIAMS
                                  United States Attorney for the
                                  Southern District of New York
                                  One St. Andrew's Plaza
                                  New York, NY 10007

Elizabeth A. Espinosa
Jonathan L. Bodansky
William Kinder
Assistant United States Attorneys
    *Of Counsel*

## TABLE OF CONTENTS

BACKGROUND.................................................................................................................. 2

     A.  The February 7, 2019 Border Search ...................................................... 2

     B.  The July 26, 2022 Arrest....................................................................... 3

     C.  The Passports Intercepted from the Mail .............................................. 4

ARGUMENT .................................................................................................................... 4

I.     The Defendant's Motion to Suppress Statements Should be Denied ............................... 4

II.    The Defendant's Motion to Suppress Evidence Seized During the Border
     Searches at JFK Should Be Denied................................................................................. 4

     A.  Applicable Law .................................................................................... 4

     B.  Discussion ........................................................................................... 10

III.   The Defendant's Motion to Suppress Evidence Seized from His Residence
     Should Be Denied After a Hearing................................................................................. 16

     A.  Applicable Law .................................................................................... 16

     B.  Discussion ........................................................................................... 17

IV.   The Defendant's Motion to Suppress Evidence Intercepted from International
     Mail Should be Denied .................................................................................................. 18

CONCLUSION ................................................................................................................. 19

The Government respectfully submits this memorandum of law in opposition to motions by defendant Chinwendu Alisigwe (the "defendant" or "Alisigwe") to suppress: (1) any statements made by Alisigwe during interviews with federal law enforcement agents at JFK International Airport ("JFK") on February 7, 2019, and March 1, 2021, after Alisigwe returned from international travel (the "Challenged Statements"); (2) the results of two manual reviews of Alisigwe's phone conducted by agents at JFK on the same days (the "Border Searches"); (3) certain fraudulent passports seized in plain view at the time of Alisigwe's arrest; and (4) certain fraudulent passports seized by Customs and Border Protection ("CBP") from international mail intercepted at the United States' border.    (*See* Dkt. No. 28 ("Def. Mem.").)

The Court should deny the defendant's motions in their entirety.

*First*, the defendant was not in custody when he made the Challenged Statements, and therefore agents were not required to give *Miranda* warnings.    Regardless, the Court need not address this issue at this time, as the Government presently has no intention to offer the Challenged Statements at trial.    This motion is therefore moot.

*Second*, the Border Searches comported with the Fourth Amendment because they were routine searches—which do not require either reasonable suspicion or a warrant—but were nevertheless also supported by reasonable suspicion.    Moreover, even if the Court were to decide that the Border Searches were not justified by the border search exception, the extreme remedy of suppression would not be appropriate because law enforcement agents acted on the basis of good faith, given the extensive case law permitting warrantless searches of cellphones at the border. This motion should therefore be denied without a hearing.

*Third*, because the defendant's declaration has put material facts in dispute with respect to the seizure of four passports from his home, the Government concedes that a hearing is needed on

this point.    The Government submits that at such a hearing, the evidence will show that the passports were observed by law enforcement officers in plain sight while the officers effectuated Alisigwe's arrest and prepared him for transportation to court.    Thus, the warrantless seizure of that evidence was entirely appropriate and permissible under the plain view exception.

*Last*, the fraudulent passports seized by CBP from international mail intercepted at the border were lawfully taken under CBP's warrantless border search authority.    Thus, the warrantless seizure of that evidence was entirely permissible, and this motion should be denied without a hearing.

## BACKGROUND

### A.    The February 7, 2019 Border Search

In late 2018, Homeland Security Investigations ("HSI") received information from the HSI Attaché in London, United Kingdom, indicating that Alisigwe was using multiple identities, including a fraudulent passport from the Republic of South Africa in the name Wilhelm Heinz (the "Heinz Passport").    (Dkt. No. 28-1 at 11.)    Using facial recognition software, CBP matched the photograph on the fraudulent Heinz Passport to Alisigwe.

On February 7, 2019, Alisigwe landed at JFK after traveling from Lagos, Nigeria through London.    CBP agents directed Alisigwe to a secondary inspection area, where he was met by two HSI agents.    Alisigwe agreed to speak with the agents, who did not give him *Miranda* warnings. The agents asked Alisigwe about his travel to Nigeria, his family, his employment in the United States, and the property he owned in the United States.    (Dkt. No. 28-1 at 12.)    The agents also asked Alisigwe if he ever used passports from other countries or other names and showed him a photograph of himself taken from the Heinz Passport.    During the encounter, the HSI agents asked Alisigwe to unlock his cellphone, which Alisigwe did.    The agents then conducted a

manual search of Alisigwe's cellphone.    They did not forensically extract the cellphone; rather, an agent manually went through the cellphone and took photographs of relevant material using his own cellphone.    After the agents conducted the review, they returned the cellphone to Alisigwe.

Similarly, on March 1, 2021, Alisigwe again flew into JFK and was met by CBP officers, who escorted him to an interview room.    The CBP officers interviewed Alisigwe about the purpose of his travel and again asked him to unlock his cellphone.    (*Id.* at 15.)    The CBP officers provided the unlocked cellphone to HSI agents, who again conducted a manual review but did not forensically extract the cellphone.

### B.    The July 26, 2022 Arrest

On the morning of July 26, 2022, in connection with this case, law enforcement agents arrested Alisigwe at his residence pursuant to an arrest warrant.    (Ex. A, Decl. of Special Agent William McKeen ¶ 2.)    The agents first knocked on the door of the residence and announced their presence.    (*Id.* ¶ 3.)    After receiving no answer, they breached the door, entered the residence, and encountered Alisigwe as he was exiting his bedroom.    (*Id.* ¶¶ 3-4.)    The agents placed Alisigwe under arrest, then accompanied him into his bedroom so that he could find appropriate clothing for his transportation to court.    (*Id.* ¶ 5.)    It was at that time, while conducting a protective sweep of the room prior to the defendant's reentry into that area, that the agents observed on the floor of the bedroom, in plain view to the side of the bed, a stack of four passports, including a Kenyan passport.    (*Id.* ¶ 6.)    Special Agent McKeen, who first observed the passports, immediately recognized the items as possible contraband—based on his knowledge that Alisigwe is not a Kenyan citizen, and his knowledge of Alisigwe's extensive use of fraudulent identification documents, including passports, in connection with the criminal conspiracy that is the subject of this case—and seized them as such.    (*Id.* ¶¶ 7-8.)

C.      **The Passports Intercepted from the Mail**

Both prior to and subsequent to Alisigwe's arrest, law enforcement intercepted and seized additional fraudulent passports within international mail addressed to Alisigwe.    Those passports were mailed from overseas and intercepted by CBP at the border, pursuant to CBP's warrantless border search authority.

## ARGUMENT

I.      **The Defendant's Motion to Suppress Statements Should be Denied**

Questioning someone entering the United States at the border, in most circumstances, does not amount to a "custodial interrogation" that requires the provision of *Miranda* warnings, even if the questioning occurs in a setting in which the subject is not freely permitted to leave.    *United States v. FNU LNU*, 653 F.3d 144, 148 (2d Cir. 2011).    Nevertheless, the Court need not address this issue at this time, as the Government presently has no intention to offer at trial any statements made by the defendant during his February 7, 2019, and March 1, 2021 interviews at JFK.    This motion is therefore moot.

II.     **The Defendant's Motion to Suppress Evidence Seized During the Border Searches at JFK Should Be Denied**

A.      **Applicable Law**

1.      **The Border Search Authority to Search Electronic Devices Without a Warrant**

The "border search" exception is a "longstanding, historically recognized exception to the Fourth Amendment's general principle that a warrant be obtained" for a search.    *United States v. Ramsey*, 431 U.S. 606, 621 (1977).    That longstanding principle reflects that "[t]he Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border."    *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004).    In addition, "[t]he

4

expectation of privacy [is] less at the border than in the interior." *United States v. Montoya de Hernandez*, 473 U.S. 531, 539 (1985). Consequently, the "Fourth Amendment balance between the interests of the Government and the privacy right of the individual is struck much more favorably to the Government at the border." *Id.* at 540.

Under the border search exception, routine searches of an incoming traveler's person and belongings are "not subject to any requirement of reasonable suspicion, probable cause, or warrant." *Montoya de Hernandez*, 473 U.S. at 538. "Routine searches include those searches of outer clothing, luggage, a purse, wallet, pockets, or shoes which, unlike strip searches, do not substantially infringe on a traveler's privacy rights." *United States v. Irving*, 452 F.3d 110, 123 (2d Cir. 2006).

The Second Circuit has explained that, even for non-routine border searches, no warrant is required. Rather, a non-routine border search is valid "if it is supported by reasonable suspicion." *Irving*, 452 F.3d at 124; *see also United States v. Asbury*, 586 F.2d 973, 977 (2d Cir. 1978) (affirming validity of warrantless border strip search). The reasonable suspicion standard requires "'considerably less than proof of wrongdoing by a preponderance of the evidence'"; indeed, it requires only "'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Levy*, 803 F.3d 120, 123 (2d Cir. 2015) (quoting *Navarette v. California*, 572 U.S. 393, 396-97 (2014)). Reasonable suspicion is measured in light of the "totality of the circumstances – the whole picture," *Navarette*, 572 U.S. at 397 (quotation marks omitted), and the "actual motivations of the individual officers involved . . . play no role in [the] Fourth Amendment analysis." *Whren v. United States*, 517 U.S. 806, 813 (1996). For this reason, "the validity of a border search does not depend on whether it is prompted by an

investigative motive."   *Irving*, 452 F.3d at 123.   Rather, "the level of intrusion into a person's privacy is what determines" whether the search is routine or non-routine.   *Id.*

The Second Circuit has not yet specifically addressed the standard for a border search of a cellphone.   But other circuit courts have found that a forensic search of a cellphone by law enforcement agents—which is more than the manual review conducted here—requires only reasonable suspicion.   *See United States v. Williams*, 942 F.3d 1187, 1190-91 (10th Cir. 2019) (affirming border search of laptop computer supported by reasonable suspicion, but declining to decide whether that standard was constitutionally required); *United States v. Aigbekaen*, 943 F.3d 713, 720-21 (4th Cir. 2019) (forensic search of a cellphone requires reasonable suspicion "of an offense that bears some nexus to the border search exception's purposes"); *United States v. Cano*, 934 F.3d 1002, 1016, 1018 (9th Cir. 2019) ("the forensic examination of a cell phone requires a showing of reasonable suspicion").   The Ninth Circuit has found that a <u>manual</u> search of a cellphone, however, can be conducted without reasonable suspicion.   *Cano*, 934 F.3d at 1016, ("manual searches of cell phones at the border are reasonable without individualized suspicion"). Last, the Tenth Circuit has held that even a forensic search of a cellphone can be conducted without reasonable suspicion.   *United States v. Touset*, 890 F.3d 1227, 1233 (11th Cir. 2018) ("We see no reason why the Fourth Amendment would require suspicion for a forensic search of an electronic device when it imposes no such requirement for a search of other personal property.").

No Court of Appeals has held that the Supreme Court's decision in *Riley v. California*, 573 U.S. 373 (2014), which addressed the search of a cellphone in the domestic interior, imposes a warrant requirement for the search of phone at the border.   *See Alasaad v. Mayorkas*, 988 F.3d 8, 16-17 (1st Cir. 2022) ("*Riley* does not command a warrant requirement for border searches of electronic devices, nor does the logic behind *Riley* compel us to impose one"); *Cano*, 934 F.3d at

6

1015 ("post-*Riley*, no court has required more than reasonable suspicion to justify even an intrusive border search" and noting that "[e]very circuit that has faced this question has agreed that *Riley* does not mandate a warrant requirement for border searches of electronic devices, whether basic or advanced"); *United States v. Wanjiku*, 919 F.3d 472, 483-84 (7th Cir. 2019) ("no circuit court, before or after *Riley*, has required more than reasonable suspicion for border search of cell phones or electronically-stored data"); *United States v. Molina-Isidro*, 884 F.3d 287, 291-92 (5th Cir. 2018) ("For border searches both routine and not, no case has required a warrant. . . .    [I]t is telling that no post-*Riley* decision issued either before or after this search has required a warrant for a border search of an electronic device."); *United States v. Vergara*, 884 F.3d 1309, 1312 (11th Cir. 2018) ("The forensic searches of Vergara's phones required neither a warrant nor probable cause.").

Many district courts within the Second Circuit have affirmed the validity of border searches of cellphones and other electronic devices based on reasonable suspicion.    *See, e.g.*, *United States v. Oladokun*, No. 15 Cr. 559 (BMC), 2016 WL 4033166, at *7 (E.D.N.Y. July 27, 2016) (denying motion to suppress); *United States v. Dattmore*, No. 12 Cr. 166A, 2013 WL 4718614, at *4 (W.D.N.Y. Sept. 3, 2013) ("Searches of computers and electronic devices are likewise considered routine searches that may be conducted in the absence of reasonable suspicion."); *United States v. Young*, 12 Cr. 210 (RJA) (JJM), 2013 WL 885288, at *2 (W.D.N.Y. Jan. 16, 2013) (same); *United States v. Singh*, No. 12 Cr. 121 (DLI), 2012 WL 2501032, at *3 (E.D.N.Y. June 27, 2012) ("Even assuming, for the sake of argument only, that such a search [of cellphone data] is too invasive to be considered routine, the government's search of [d]efendant's cell phone was proper because it was supported by reasonable suspicion.").

Indeed, as of the time of the border searches being challenged here, only a single district court within this Circuit had held that a warrant was required to search a cellphone at the border. *See United States v. Djibo*, 151 F. Supp. 3d 297, 309-10 (E.D.N.Y. 2015) (granting motion to suppress evidence obtained from forensic search of outgoing traveler's cellphone as fruit of an illegal initial search and suggesting that border searches are limited to contraband and national security). Since the time of these searches, a different district court judge has held in two separate cases that a warrant is required to search a cellphone at the border. It is worth noting that in both cases the district court ultimately did not suppress the evidence, in one case due to the good faith exception and in the other case due to the inevitable discovery doctrine. *See United States v. Smith*, No. 22-CR-352 (JSR), 2023 WL 3358357, at *8 (S.D.N.Y. May 11, 2023) (holding that warrantless searches of cellphones at the border are unconstitutional absent exigent circumstances but declining to suppress the fruits of the search under the good faith exception); *United States v. Booth*, 583 F.Supp.3d 545, 554 (S.D.N.Y. Feb. 1, 2022) ( holding that a warrant was required to search the cell phone of a U.S. citizen seized at the border, but declining to suppress evidence as subsequent warrant meant that inevitable discovery doctrine applied).

Further, consistent with the caselaw at the circuit-level upholding warrantless searches of cellphones at the border, CBP issued a directive (the "Directive") in 2018 to its officers on the conduct of border searches. CBP Directive Regarding Border Searches of Electronic Devices, available at https://www.dhs.gov/sites/default/files/publications/CBP%20Directive%203340-049A_Border-Search-of-Electronic-Media.pdf (last accessed Aug. 4, 2023). Pursuant to the Directive, an advanced or forensic search may be conducted where "there is reasonable suspicion of activity in violation of the laws enforced or administered by CBP." *Id.* Title 18 of the United States Code is among the laws enforced by CBP. *See* "Summary of Laws Enforced by CBP,"

*available at* https://www.cbp.gov/trade/rulings/summary-laws-enforced/us-code (last accessed Aug. 4, 2023).

The Second Circuit has held that when conducting border searches, CBP officers are "neither expected not required to ignore evidence of a federal crime" and have "the authority to search and review a traveler's documents and other items at the border when they reasonably suspect the traveling is engaged in criminal activity, even if the crime falls outside the primary scope of their duties." *Levy*, 803 F.3d at 120 (holding that CBP border search of notebook was permissible where CBP had reasonable suspicion that traveler "was engaged in a financial crime"); *see also United States v. Irving*, 452 F.3d 110, 123 (2d Cir. 2004) (the validity of a border search "does not depend on whether it is prompted by a criminal investigation motive"); *United States v. Bongiovanni*, 19 Cr. 227 (JLS) (MJR), 2022 WL 17481884, at *8 (W.D.N.Y. Aug. 5, 2022) ("Here, the Court applies the Second Circuit's reasoning in *Levy* and *Irving* and concludes that the officers' decision to search Bongiovanni's phone because he was the subject of a domestic criminal investigation unrelated to his international travel did not take the search outside the scope of the border exception to the warrant requirement.").

### 2. The Good Faith Exception

"As both the Supreme Court and Second Circuit have held, a violation of the Fourth Amendment does not necessarily result in the application of the exclusionary rule." *United States v. Kim*, No. 16-CR-191, 2017 WL 5256753, at *3 (E.D.N.Y. Nov. 10, 2017) (*citing United States v. Rosa*, 626 F.3d 56, 64 (2d Cir. 2010)); *Herring v. United States*, 555 U.S. 135, 138 (2009); *see also United States v. Leon*, 468 U.S. 897, 906 (1984) ("Whether the exclusionary sanction is appropriately imposed in a particular case, our decisions make clear, is an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were

violated by police conduct." (internal citation omitted)).    "The rule's corrective value justifies its cost when the police 'exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights.'"    *United States v. Raymonda*, 780 F.3d 105, 117–18 (2d Cir. 2015) (*quoting United States v. Stokes*, 733 F.3d 438, 443 (2d Cir. 2013)).    With those remedial purposes in mind, the good-faith exception asks "whether a reasonably well-trained officer would have known that the search was illegal in light of all of the circumstances."    *Herring*, 555 U.S. at 145. "[W]hen the Government acts with an objectively reasonable good-faith belief that their conduct is lawful, the exclusionary rule does not apply." *United States v. Zodhiates*, 901 F.3d 137, 143 (2d Cir. 2018); *see United States v. Leon*, 468 U.S. 897, 922 n. 23 (1984) (explaining that the "good faith" exception is an objective test requiring reviewing courts to evaluate "the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization").

### B.    Discussion

#### 1.    The Border Searches at JFK Were Permissible

Alisigwe argues that the Court should draw no distinction between routine and non-routine searches at the border and that such a distinction is unreasonable.    The Second Circuit has not adopted such a rule and other courts have held that routine border searches do not require even reasonable suspicion.    *See United States v. Cano*, 934 F.3d 1002, 1016, 1018 (9th Cir. 2019) ("manual searches of cell phones at the border are reasonable without individualized suspicion"). In this case, the agents conducted routine searches of Alisiwe's cellphones on both occasions, as they did a manual review of his cellphones and did not conduct a forensic examination. Consequently, neither reasonable suspicion nor a warrant were required.

Even if this Court were to find that the manual searches of Alisigwe's cellphones were not routine—which the Government submits it should not—the HSI agents had reasonable suspicion for each search.    Reasonable suspicion of criminal activity is a "particularized and objective basis for suspecting the particular person stopped of criminal activity."    *Navarette*, 572 U.S. at 396. This standard does not require that the criminal activity suspected be in progress at the precise moment of the stop, only that there is reasonable suspicion that the device will contain relevant evidence of the crime.    Prior to the February 7, 2019 border search, HSI agents had learned from their counterparts in London that Alisigwe was using a fraudulent South African passport using the name Wilhelm Heinz and had identified Alisigwe as the individual depicted on the Heinz Passport using facial recognition software.    As a result, HSI, the FBI, and the New York City Police Department had opened an investigation into Alisigwe's criminal conduct and his use of the fraudulent Heinz Passport.    The agents certainly had reasonable suspicion that Alisigwe was engaged in fraudulent activity, including the use of a fraudulent passport, and that evidence of such activity would be found on his cellphone.

Between the February 7, 2019 border search and the March 1, 2021 border search, the agents conducted a substantial amount of additional investigation—subpoenaing bank records and identifying multiple additional fraudulent identification documents used by Alisigwe, interviewing victims of fraud whose money was deposited into accounts Alisigwe opened using false identification documents, and seizing additional fraudulent passports at the border bearing Alisigwe's photograph and in the names of other individuals—demonstrating that co-conspirators were sending Alisigwe fraudulent passports from outside the United States.    By the time of the second border search, law enforcement agents therefore had abundant evidence that Alisigwe was

conspiring with others to use false identities to commit bank fraud and was using fraudulent means of identification, including fraudulent passports.

The agents therefore had reasonable suspicion when conducting both Border Searches that Alisigwe was engaged in ongoing criminal activity, and that evidence of such criminal activity would be found on Alisigwe's phones.   Further, such criminal activity—the use of fraudulent passports to, among other things, travel into the United States—fell squarely within the primary scope of the duties of the CBP and HSI officers involved in the search, although the Second Circuit has indicated that this is not necessary.   *Levy*, 803 F.3d at 120.   Last, the criminal activity fell well within what some courts have identified as "the border search exception's purpose of protecting national security" and "blocking the entry of unwanted persons" that some courts have deemed necessary, although again, the Second Circuit has not imposed this requirement on border searches.   *See Aigbekaen*, 943 F.3d at 721.

Alisigwe argues, on the basis of case law in the Fourth and Ninth Circuits that has not been adopted by this or any other Circuit, that search was not conducted to locate contraband.   (Def. Mem. at 4-6.)   This argument fails.   *First*, the standards in those Circuits do not control here. *Second*, to the extent that Alisigwe is invoking the Ninth's Circuit singular view that the border search authority extends only to digital contraband, that view, respectfully, "fails to appreciate the full range of justifications for the border search exception beyond the prevention of contraband itself entering the country."   *Alasaad*, 988 F.3d at 21.   Indeed, the First Circuit rejected the Ninth Circuit's approach and concluded in *Alasaad* that the border search exception allows for the search of electronic devices for "contraband, evidence of contraband, or for evidence of activity in violation of the laws enforced or administered by CBP or ICE."   *Id.*   Here, at the time of the border searches, federal agents had reasonable suspicion that Alisigwe was committing two Title

18 offenses—bank fraud conspiracy and aggravated identity theft, *i.e.*, laws enforced or administered by CBP or ICE.    *Id.*

### 2.    Law Enforcement Acted in Good Faith When They Relied on a Uniform Body of Circuit-Level Case Law Upholding the Warrantless Search of An Electronic Device

Even if the Court were to hold that that the manual reviews of Alisigwe's cellphones were unlawful, all the agents were clearly acting in good faith when they conducted the reviews. Therefore, the extreme remedy of suppression is not warranted on the basis of the good faith exception.

The agents possessed an objective, good faith belief that their conduct did not violate the Fourth Amendment given the state of the law at the time Alisigwe's cellphones were manually reviewed at the border in 2019 and 2021 and they did so in the context of case law that allowed warrantless routine and non-routine searches of cellphones.    There was no controlling authority from either the Supreme Court or the Second Circuit holding that border searches of cell phones were not constitutional, and in fact, those courts have strongly indicated that they are permissible. *See Levy*, 803 F.3d at 124 (CBP officers "have the authority to search and review a traveler's documents and other items at the border when they reasonably suspect that the traveler is engaged in criminal activity, even if the crime falls outside the primary scope of their official duties"); *see also United States v. Linarez–Delgado*, 259 F. App'x 506, 508 (3d Cir. 2007) ("Customs Officers exercise broad authority to conduct routine searches and seizures for which the Fourth Amendment does not require a warrant, consent, or reasonable suspicion. . . .   Data storage media and electronic equipment, such as films, computer devices, and videotapes, may be inspected and viewed during a reasonable border search." (citations omitted)).    The Supreme Court has never required a warrant for any search at the border, and the Second Circuit has affirmed warrantless

searches of electronic diskettes, which, like a thumb drive or a cellphone, could contain substantial quantities of digital data. *Irving*, 452 F.3d at 123-24.[1]  Law enforcement here therefore had every reason to believe that they had lawfully conducted routine border searches of Alisigwe's cellphones.[2]  Accordingly, the good faith exception should cover the warrantless search here. *Zodhiates*, 901 F.3d at 143 ("[W]hen the Government acts with an objectively reasonable good-faith belief that their conduct is lawful, the exclusionary rule does not apply.").

When Judge Rakoff ruled that a warrantless border search of a cellphone is unconstitutional in *Smith*—after the searches at issue here—he nevertheless declined to suppress the evidence, finding that the agents acted in good faith.    Judge Rakoff wrote,

> [T]he breadth of the "border search exception" was still largely in place at the time of the search. Indeed, two of four federal circuit courts of appeals that had addressed forensic searches of cell phones at the border had held that such seizures and searches were lawful without warrants independent of any nexus between the search and a border-related rationale.  While two other circuit courts had indicated to the contrary, given the historic breadth of the "border search exception," a reasonable government agent could have a good faith belief that such a search as was conducted here was permissible absent Supreme Court or Third Circuit precedent to the contrary.
>
> Furthermore, even if that were not enough, a reasonable border agent could have in good faith believed that the search conducted here was expressly warranted by a 2018 CBP directive, which purports to allow so-called "manual" phone searches at the border without any heightened standard of suspicion and "advanced

---

[1]  As to the types of crimes that may be investigated pursuant to the border search exception, the recent Fourth and Ninth Circuit are not "binding appellate precedent" for purposes of the *Davis* good faith analysis.  *See United States v. Aguiar*, 737 F.3d 251, 261 (2d Cir. 2013) ("In the context of statutory interpretation, 'binding precedent' refers to the precedent of this Circuit and the Supreme Court.").

[2]  Indeed, the objective reasonableness of that belief – and law enforcement's good faith – is further bolstered by the Eleventh Circuit's 2018 decision in *Touset*, after *Riley* and before the search here, that *no suspicion* is necessary for the warrantless border search of an electronic device.   890 F.3d at 1229.

search[es]" -- which entail "connect[ing] external equipment, through a wired or wireless connection, to an electronic device not merely to gain access to the device, but to review, copy, and/or analyze its contents" -- whenever "there is reasonable suspicion of activity in violation of the laws enforced or administered by CBP"[11] or "when there is a national security concern...." CBP Directive No. 3340-049A at 4-5, U.S. Customs and Border Protection (Jan. 4, 2018), Dkt. 159-1.

*United States v. Smith*, No. 22-CR-352 (JSR), 2023 WL 3358357, at *13 (S.D.N.Y. May 11, 2023). The same reasoning applies here.   Both of the border searches in this case took place before the search at issue in *Smith* (which occurred on March 2, 2021) and the agents were acting in accordance with controlling law and CBP policy at the time.

The Fourth Circuit's decision in *Aigbekaen* is similarly on point.   While the Fourth Circuit held that the border search at issue in that case was unlawful because the crimes being investigated were outside the scope of the border search authority, it nevertheless upheld the use of that evidence on the basis of the good-faith expectation.   The Fourth Circuit reasoned that the "HSI agents who searched Aigbekaen's devices in May of 2015 reasonably relied on an 'established and uniform body of precedent allowing warrantless border searches of digital devices.'"   *Aigbekaen*, 943 F.3d at 725 (4th Cir. 2019).   It further noted that it was not until the day of its decision that the Circuit had cabined the scope of the border search exception.   *Id.* ("Given the uniform body of precedent that permitted warrantless searches at the border in May of 2015, we cannot help but conclude that the good-faith exception applies here."); *see also Wanjiku*, 919 F.3d at 479 (declining to decide whether a warrantless search at the border of a cellphone was lawful and denying a suppression motion because the "agents acted in good faith when they searched the devices with reasonable suspicion to believe that a crime was being committed, at a time when no court had ever required more than reasonable suspicion for any search at the border.").

Under these circumstances, there would be no deterrent benefit to suppressing the results of the manual border searches of Alisigwe's cellphones.   "[T]he harsh sanction of exclusion should not be applied to deter [this] objectively reasonable law enforcement activity."   *Davis v. United States*, 564 U.S. 229, 241 (2011) (citation and quotation marks omitted); *see also United States v. Aguilar*, 973 F.3d 445, 450 (5th Cir. 2020) (agents acted reasonably when they ''continued to rely on the robust body of pre-*Riley* case law that allowed warrantless border searches of computers and cellphone,'" where agents had "a particularized and objective basis for suspecting [the defendant] of criminal activity") (quoting *United States v. Molina-Isidoro,* 884 F.3d 287, 292 (5th Cir. 2018)); *Zodhiates*, 901 F.3d at 143.   The law enforcement agents who conducted the search acted in good faith, on the basis of case law upholding the warrantless search of cellphones at the border.   Accordingly, even if the Court were to conclude that the border searches of Alisigwe's phones were unlawful, the evidence should not be suppressed on the basis of the good faith exception.

### III.   The Defendant's Motion to Suppress Evidence Seized from His Residence Should Be Denied After a Hearing

#### A.   Applicable Law

"An arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton v. New York*, 445 U.S. 573, 603 (1980).   Thus, law enforcement officers "[g]enerally do not need a search warrant to enter a suspect's home when they have an arrest warrant for the suspect."   *United States v. Lauter*, 57 F.3d 212, 214 (2d Cir. 1995).   Once inside a suspect's home, officers may then perform a "protective sweep" to protect themselves or others.   *Id.* at 216.

Furthermore, under the "plain view" doctrine, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers

have a lawful right of access to the object, they may seize it without a warrant." *United States v. Delva*, 858 F.3d 135, 149 (2d Cir. 2017) (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993)).    That is because, "[i]f an article is already in plain view, neither its observation nor its seizure would involve any invasion of privacy." *Id.* (quoting *Horton v. California*, 496 U.S. 128, 133 (1990)).    Thus, "when law enforcement officers have lawfully entered premises in connection with an arrest, and in the course of making a permissible quick and limited protective sweep of the premises they see an object whose incriminating character is immediately apparent, 'and if the officers have a lawful right of access to the object, they may seize it without a warrant.'" *Id.* (quoting *Dickerson*, 508 U.S. at 375).    This is so even where "the discovery of the evidence was not inadvertent." *Id.* (quoting *Horton*, 496 U.S. at 130 ("[E]ven though inadvertence is a characteristic of most legitimate 'plain-view' seizures, it is not a necessary condition.")).

## B.    Discussion

Alisigwe argues that the four passports seized from his residence on July 26, 2022, incident to his arrest, "were the product of an unreasonable search and seizure, and should . . . be suppressed." (Def. Mem. 7-8.)    Alisigwe asserts that the passports were recovered from inside a closed envelope located underneath his bed, while he was handcuffed in another room, and thus, he argues, their seizure was not lawful. (*Id.*)    His arguments are factually and legally incorrect. The Government concedes, however, that because the defendant's declaration has put material facts in dispute, a hearing is necessary to resolve this motion.[3]

---

[3] As noted in the defendant's memorandum (*see* Def. Mem. 1 n.1), the Government consented to the defendant filing, in the first instance, an unsigned declaration in support of his motions. That was on the understanding, however, that the defense would subsequently file a signed declaration. Accordingly, the Government respectfully requests that the defense file a signed declaration from the defendant as soon as possible.

The Government respectfully submits that at such a hearing, the evidence will show that law enforcement's seizure of the four passports at issue was entirely lawful.   As the attached declaration of Special Agent McKeen makes clear, the passports were neither inside an envelope nor underneath Alisigwe's bed.   Rather, they were loose on the floor of Alisigwe's bedroom in a stack next to his bed, and in plain view when Special Agent McKeen and other law enforcement officers accompanied the defendant into his bedroom to get dressed and performed a brief protective sweep of the area.   Moreover, it was readily apparent to Special Agent McKeen that the passports were potential contraband, given that the passport on the top of the stack appeared to be a Kenyan passport—whereas Alisigwe is a citizen of only Nigeria—and given that Alisigwe was already known to have used multiple false identification documents, including passports, in connection with this scheme.   Accordingly, Special Agent McKeen's seizure of the four passports fell squarely within the "plain view" exception to the warrant requirement.

## IV.   The Defendant's Motion to Suppress Evidence Intercepted from International Mail Should be Denied

Alisigwe argues that passports seized from the mail by law enforcement should be suppressed because, he argues, "[t]he Fourth Amendment protects a person's mail from government search or seizure without a warrant."   (Def. Mem. 9 (citing *United States v. Van Leeuwen*, 397 U.S. 249 (1970)).)   Again, Alisigwe's argument fails.

Alisigwe entirely ignores the fact that here, the passports at issue were shipped to Alisigwe from overseas and intercepted at the border by CBP pursuant to its border search authority.   As discussed above, *see supra* Section II, it is well established that "the Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior." *Montoya de Hernandez*, 473 U.S. at 538.   And indeed, "[r]outine searches of the persons and

18

effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant, and first-class mail may be opened without a warrant on less than probable cause." *Id.* Thus, CBP's warrantless search and seizure of the passports was entirely permissible, and Alisigwe's motion should be denied.

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that the defendant's motions should be denied.

Dated: New York, New York
August 4, 2023

Respectfully Submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By:   /s/_____
Elizabeth A. Espinosa
Jonathan L. Bodansky
William Kinder
Assistant United States Attorneys
(212) 637-2216

19