USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/30/2023

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
:
UNITED STATES OF AMERICA,                              :
:
          -against-                            :      22-CR-425 (VEC)
:
:      OPINION AND ORDER
CHINWENDU ALISIGWE,                                    :
                       Defendant.        :
:
------------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

        Chinwendu Alisigwe ("Alisigwe") is charged with conspiracy to commit bank fraud, bank fraud, aggravated identity theft, and conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1344, 1028A, and 1956(a)(1)(B)(i). *See* Superseding Indictment, Dkt. 62. The Government alleges that he opened bank accounts using fake forms of identification and withdrew funds that he knew were the proceeds of unlawful activity from those accounts. *See* Compl., Dkt. 1; Superseding Indictment, Dkt. 62. On January 6, 2023, Alisigwe moved to suppress (1) evidence obtained from searches of his cellphones conducted at the border upon his return to the United States; (2) evidence seized from Alisigwe's home at the time of his arrest; and (3) evidence intercepted from Alisigwe's mail. *See* Def. Not. of Mot., Dkt. 27; Def. Mem., Dkt. 28.[1] The Court held an evidentiary hearing on November 17, 2023 (the "Suppression Hearing").[2] For the following reasons, Alisigwe's motion to suppress is DENIED.

---

[1]     Alisigwe also moved to suppress statements made to law enforcement at the border. *See* Def. Mem., Dkt. 28, at 2. Because the Government does not intend to offer those statements at trial, *see* Gov't Mem., Dkt. 57 at 4, the Court denies Alisigwe's motion as moot.

[2]     The evidentiary hearing pertained solely to the lawfulness of a seizure of evidence from Alisigwe's home at the time of his arrest. *See* Order, Dkt. 58.

1

On October 20, 2023, Alisigwe filed a motion to reconsider the Court's June 23, 2023, Opinion and Order precluding him from presenting a duress defense at trial ("Duress Opinion"). *See* Motion, Dkt. 83. The Court held oral argument on the motion for reconsideration at the Suppression Hearing. *See* Order, Dkt. 88. For the reasons discussed below, Alisigwe's motion to reconsider the Duress Opinion is DENIED.

## BACKGROUND

Motion to Suppress

In 2018, Homeland Security Investigations ("HSI") received information from a London-based HSI attaché that Alisigwe was using multiple identities and had possessed a fraudulent South African passport bearing his photograph and another person's name. *See* Report of Investigation ("ROI"), Dkt. 28-1 at 1–2. Based on that information, the U.S. Department of Homeland Security ("DHS") opened an investigation into Alisigwe. *See id.* at 1.

On February 7, 2019, Alisigwe was stopped by U.S. Customs and Border Protection ("CBP") agents at John F. Kennedy International Airport ("JFK Airport") upon his return to the United States from Nigeria. *See* Alisigwe Decl., Dkt. 59 ¶ 4–5; ROI at 2; Gov't Mem., Dkt. 57 at 2. Alisigwe agreed to speak to HSI agents. *See* Alisigwe Decl. ¶¶ 10–16; Gov't Mem. at 2. The HSI agents took Alisigwe's cellphone, directed him to unlock it, and took the phone to another room. *See* Alisigwe Decl. ¶ 15. The parties do not dispute that law enforcement searched Alisigwe's cellphone manually (without deploying forensic tools) and then returned the phone to Alisigwe. *See* Gov't Mem. at 2–3.[3]

On March 1, 2021, Alisigwe was again stopped by CBP agents at JFK Airport upon his return to the United States. *See* Alisigwe Decl. ¶ 17. The CBP agents took two cellphones from

---

[3] Alisigwe did not reply to the Government's response asserting that the search was a manual search.

Alisigwe, directed him to unlock the phones, and took the phones to another room.  *See* Alisigwe Decl. ¶ 17; FBI Report, Dkt. 28-2.  The parties do not dispute that HSI agents again searched Alisigwe's cellphones manually.  *See* Gov't Mem. at 3.[4]  The cellphones were presumably returned to Alisigwe.

On July 26, 2022, around 6:00 A.M, Alisigwe was arrested inside his home in Queens pursuant to an arrest warrant.  *See* Suppression Hearing Tr. at 7–8; Alisigwe Decl. ¶ 18.  The parties dispute what happened next.  According to Alisigwe, law enforcement forced open all of his doors and seized an opaque envelope that was hidden under his bed while Alisigwe waited handcuffed by the front door of the apartment.  *See* Alisigwe Decl. ¶¶ 19–21.  According to the Government,  FBI Special Agent William McKeen ("Agent McKeen") and another agent conducted a "protective sweep" of Alisgwe's bedroom after he was arrested in the living room.  *See* Suppression Hearing Tr. at 12.  After finishing the protective sweep and determining the bedroom was clear of persons, Detective Justine Killion of the NYPD/FBI Cyber Crime Task Force ("Detective Killion") brought Alisigwe into the bedroom so that he could change into clothing appropriate for his initial appearance in court later that day.  *Id.* at 14–15, 50.  While Agent McKeen was standing in the bedroom following his protective sweep and only about 30 to 40 seconds after Alisigwe entered the room, Agent McKeen saw a stack of passports on the floor beside the bed across the room from the doorway into the bedroom.  *Id.* at 16, 19.  The top passport in the stack was a Republic of Kenya passport.  *Id.* at 16–17.  Based on his knowledge that Alisigwe had allegedly used fraudulent passports in connection with a criminal scheme and that he is a citizen of Nigeria, not Kenya, Agent McKeen recognized the passports as contraband and seized them.  *Id.* at 17.  Agent McKeen testified that he did not look under the bed and did

---

[4] Alisigwe did not reply to the Government's response asserting that the searches were manual searches.

not know whether there was an envelope underneath the bed. *Id.* at 18. While Alisigwe, Agent McKeen, Detective Killion, and a third law enforcement officer were in the bedroom, Detective Killion heard Alisigwe say, "[I]f this is not a search warrant, why is someone going through my stuff[?]" *Id.* at 52.

During the course of this investigation, CBP intercepted Alisigwe's international mail at the U.S. border and uncovered multiple false passports bearing Alisigwe's photograph and other persons' names being sent to him. *See* McKeen Decl., Dkt. 57-1 ¶ 10. The dates of the international mail seizures span from July 30, 2020, more than a year after Alisigwe was first stopped at JFK airport, to January 25, 2023, six months after he was arrested. *See* Letter, Dkt. 101.

Motion for Reconsideration

On February 24, 2023, the Court held a change-of-plea hearing, at which Alisigwe was expected to enter a guilty plea. *See* Order, Dkt. 33. His guilty plea was not accepted because during his allocution he said that he had been coerced or forced to commit the crime because of threats to his mother's life. Plea Hearing Tr., Dkt. 39 at 24–25. The Court adjourned the hearing to give defense counsel an opportunity to consult with Alisigwe to determine whether he still wished to plead guilty or wished to persist in his not guilty plea and attempt to mount a duress defense. *Id.* at 25–29. Alisigwe subsequently notified the Court that he had chosen the latter. Letters, Dkts. 41, 45.

With Alisigwe's consent, pursuant to *United States v. Bifield*, 702 F.2d 342, 346–47 (2d Cir. 1983), the Court held a pretrial evidentiary hearing on May 30, 2023, to consider whether Alisigwe could present a prima facie case of a duress defense. *See* Order, Dkt. 47. Only Alisigwe testified at the hearing. *See* Evidentiary Hearing Tr., Dkt. 53. He testified that he

opened the fraudulent bank accounts because a stranger called him and threatened his mother's life if he did not do so. *Id.* at 16–20. He did not contact the Nigerian police because he believed they would do nothing to assist him and because he was worried that the people threatening him would harm him or his mother if they found out he had contacted the police. *Id.* at 24–26. He did not contact law enforcement in the United States because, he testified, he was afraid that doing so would prevent him from complying with the stranger's orders, and if he no longer complied, his mother would be killed. *Id.* at 26–27.

On June 23, 2023, the Court held that Alisgwe had not presented a prima facie duress defense because Alisigwe unquestionably had reasonable opportunities to escape harm other than by engaging in the illegal activity by contacting law enforcement in the United States. *See* Duress Opinion, Dkt. 52 at 7–9.

## DISCUSSION

### I.   Legal Standard for the Motion to Suppress

"The Fourth Amendment to the Constitution provides that 'no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.'" *United States v. Canfield*, 212 F.3d 713, 718 (2d Cir. 2000) (quoting U.S. Const. amend. IV).

The "ultimate touchstone" of the Fourth Amendment is "reasonableness." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). To determine whether a search is reasonable, courts "examine the totality of the circumstances" and "balance, on the one hand, the degree to which [the search] intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate government interests." *In re Terrorist Bombings*, 552 F.3d 157, 172 (2d Cir. 2008) (quoting *Samson v. California*, 547 U.S. 843, 848 (2006)). A

search for evidence of criminal wrongdoing generally requires law enforcement to obtain a search warrant. *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995).

There are, of course, several well-established exceptions to the warrant requirement. *See Katz v. United States*, 389 U.S. 347, 357 (1967). Routine border searches, including searches of outer clothing and luggage, are reasonable without probable cause or a warrant in light of the Government's right to "control, subject to substantive limitations imposed by the Constitution, who and what may enter the country." *United States v. Ramsey*, 431 U.S. 606, 620 (1977); *see also United States v. Flores-Montano*, 541 U.S. 149, 153 (2004).[5] The same exception applies to searches of international mail. *See Ramsey*, 431 U.S. at 619–22. Nonroutine, "more invasive" border searches, such as strip, body cavity, or involuntary x-ray searches, do not require a warrant but do require "reasonable suspicion." *Tabbaa v. Chertoff*, 509 F.3d 89, 98 (2d Cir. 2007) (internal citation omitted). To determine whether a nonroutine search was reasonable, courts weigh "the offensiveness of the intrusion" against "the level of warranted suspicion." *United States v. Irving*, 452 F.3d 110, 123 (2d Cir. 2006). Relevant factors include "unusual conduct of the defendant, discovery of incriminating matter during routine searches, computerized information showing propensity to commit relevant crimes, or a suspicious itinerary." *Id.* at 124.

Under the "plain view" exception to the warrant requirement, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object,[6] they may seize it without a

---

[5]   An international airport "is considered the functional equivalent of a border" for Fourth Amendment purposes. *United States v. Irving*, 452 F.3d 110, 123 (2d Cir. 2006) (citing *United States v. Gaviria*, 805 F.2d 1108, 1112 (2d Cir. 1986)).

[6]   Once an arrest warrant has been obtained for a particular person, without a separate search warrant, law enforcement may enter what they reasonably believe to be the person's residence when they reasonably believe that the person is present to effectuate the arrest. *See Payton v. New York*, 445 U.S. 573, 603 (1980); *United States v.*

warrant." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993). If an article is in plain view, "neither its observation nor its seizure would involve any invasion of privacy." *Horton v. California*, 496 U.S. 128, 133 (1990).

At a suppression hearing, the Government bears the burden of justifying an exception to the warrant requirement by a preponderance of the evidence. *See United States v. Sosunov*, No. 17-CR-0350 (KBF), 2018 WL 2095176, at *6 (S.D.N.Y. May 7, 2018) (citing *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974); *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir. 1980)).

## II.   Alisigwe's Motion to Suppress Evidence Found on His Cellphones Is Denied

Alisigwe argues that evidence obtained from his cellphones should be suppressed because, although routine border searches are permissible without a warrant, border searches of cellphones are not; the unprecedented privacy interests at stake, according to Defendant, require that such searches be conducted only on the basis of a search warrant supported by probable cause. *See* Def. Mem. at 3–6 (citing *Riley v. California*, 573 U.S. 373 (2014)). The Government asserts that the "manual" review of a cellphone is a routine search, that law enforcement had reasonable suspicion justifying even a nonroutine search, and that, in all events, the good faith exception would preclude suppression of the evidence seized in this case. *See* Gov't Mem. at 10–16. The Court concludes that the border searches, although nonroutine, were justified by reasonable suspicion, and that, in any event, the good faith exception applies.

### A. Evidence from Alisigwe's Cellphones Was Lawfully Obtained

Neither the Supreme Court nor the Second Circuit has had occasion to decide whether cellphone searches at the border are routine, nonroutine, or *sui generis* such that a search based

---

*Lauter*, 57 F.3d 212, 214 (2d Cir. 1995). Law enforcement may also conduct a "protective sweep" of the premises incident to an arrest to protect themselves and others. *Maryland v. Buie*, 494 U.S. 325, 327 (1990).

on anything short of a search warrant or probable cause is unlawful. In *Riley*, the Supreme Court held that officers must generally secure a warrant before searching an arrestee's cellphone because the Government interests at stake — harm to officers and destruction of evidence — are not significantly implicated when officers are reviewing digital data and because modern cellphones raise heightened privacy interests. 573 U.S. at 386–98.

Although *Riley* enshrines the commonsense principle that searching an arrestee's digital data is significantly more intrusive than searching his physical belongings, it did not upend long-settled precedent governing border searches. As a general matter, "the Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior" and is "struck much more favorably to the Government." *United States v. Montoya de Hernandez*, 473 U.S. 531, 538–40 (1985) (noting that the expectation of privacy is "less at the border than in the interior").

The Government interests at stake also differ. At the border, CBP's primary focus is on intercepting "contraband, dutiable merchandise, immigration fraud, and terrorism," but it also has authority to engage in nonroutine searches when its agents "reasonably suspect that the traveler is engaged in criminal activity, even if the crime falls outside the primary scope of their official duties." *United States v. Levy*, 803 F.3d 120, 124 (2d Cir. 2015) (affirming the legality of a nonroutine border search because CBP officers had reasonable suspicion that the defendant "was engaged in a financial crime"); *see also* U.S. Customs & Border Prot., *Summary of Laws Enforced by CBP*, https://www.cbp.gov/trade/rulings/summary-laws-enforced/us-code (last modified Oct. 13, 2016) [hereinafter *Summary of Laws Enforced by CBP*] (listing Title 18 of the U.S. Code among the laws that CBP enforces).[7]

---

[7] Alisigwe asserts that, to the contrary, the Government's interest at the border is "limited" to the detection of contraband, "protecting national security," or "blocking the entry of unwanted persons"; according to Alisigwe, the

By contrast, when making an arrest, law enforcement is concerned with seizing weapons and preventing the destruction of evidence, goals that have little or no relation to digital data, which "cannot itself be used as a weapon" and which can be preserved through less invasive means. *Riley*, 573 U.S. at 387–91. *Riley* did not, however, impose a categorical warrant requirement on all cellphone searches, including those conducted at the border. *Cf. Alasaad v. Mayorkas*, 988 F.3d 8, 17 (1st Cir. 2021) ("Every circuit that has faced this question has agreed that *Riley* does not mandate a warrant requirement for border searches of electronic devices, whether basic or advanced."); *United States v. Wanjiku*, 919 F.3d 472, 485 (7th Cir. 2019) ("[N]o circuit court, before or after *Riley*, has required more than reasonable suspicion for a border search of cell phones or electronically-stored data.").

In this Court's view, cellphone searches cannot be conducted without reasonable suspicion of criminal activity because they are not routine border searches. The Court recognizes that there is no "precise line" between routine and nonroutine searches, *Tabbaa*, 509 F.3d at 98, and that caselaw is mixed on whether a border search of a cellphone is routine. This Court is of the view that even a manual review of the contents of a person's cellphone is on the "more invasive" end of the search spectrum. *Id.* at 98. As the Supreme Court noted in *Riley*, modern cellphones implicate privacy concerns "far beyond" those involved in routine searches of a suspect's "wallet" or "purse." 573 U.S. at 393; *see also United States v. Cano*, 934 F.3d 1002, 1016 (9th Cir. 2019) (concluding that forensic examination of a cellphone at the border requires a showing of reasonable suspicion); *United States v. Kolsuz*, 890 F.3d 133, 144 (4th Cir. 2018)

---

Government's interest does not include a "generalized interest in law enforcement and combatting crime." Def. Mem. at 4–5 (citing *United States v. Cano*, 934 F.3d 1002, 1018 (9th Cir. 2019); *United States v. Aigbekaen*, 943 F.3d 713, 721 (4th Cir. 2019)). That is not the law in this Circuit. *See United States v. Levy*, 803 F.3d 120, 124 (2d Cir. 2015) ("CBP officers . . . have the authority to search and review a traveler's documents and other items at the border when they reasonably believe that a traveler is engaged in criminal activity, even if the crime falls outside the primary scope of their official duties.").

(same); *United States v. Bongiovanni*, No. 19-CR-227 (JLS) (MJR), 2022 WL 17481884, at *11–12 (W.D.N.Y. Aug. 5, 2022) (same with respect to manual and forensic examination), *report & recommendation adopted*, 2022 WL 17139489 (W.D.N.Y. Nov. 22, 2022). Accordingly, the search of a person's cellphone at the border requires reasonable suspicion of criminal activity.[8]

On both occasions that law enforcement agents searched a cellphone belonging to Alisigwe, they had reasonable suspicion to do so. At the time of the February 7, 2019, search, DHS had launched an investigation regarding Alisigwe's use of "multiple identities." ROI at 1. The United Kingdom's border force had seized a fraudulent South African passport bearing Alisigwe's photograph, and DHS's Document and Benefit Fraud Task Force was planning to pursue criminal or administrative charges against Alisigwe. *Id.* at 1–2; *see also* Gov't Mem. at 11. Contributing to the reasonable suspicion, during the February 7, 2019, border stop, Alisigwe indicated that the photograph used in the fraudulent South African passport "look[ed] like [him]" but "repeatedly denied knowing when or where the photo was taken." ROI at 2; Alisigwe Decl. ¶ 12. Two years later when Alisigwe was stopped on March 1, 2021, law enforcement's investigation was ongoing, and the suspicion that existed in 2019 had not abated. *See generally* FBI Report, Dkt. 28-2.[9]

---

[8] The Government urges the Court to hold that a "manual," as opposed to a "forensic," cellphone search is routine because it is relatively less invasive. *See* Gov't Mem. at 10. While the Court agrees that a manual search of a cellphone is less invasive than a forensic search, it nonetheless concludes that even a manual cellphone search is nonroutine for the reasons discussed *infra*; it need not decide whether a forensic cellphone search, which the parties agree did not take place in this case, is so invasive that even reasonable suspicion is insufficient to render the search reasonable.

[9] The Government asserts in its briefing that, between the two border searches, substantial additional investigation was conducted, including issuing subpoenas for bank records, identifying additional fraudulent identification documents used by Alisigwe, interviewing victims of fraud whose money had been deposited into accounts Alisigwe opened using false identification documents, and seizing additional fraudulent passports at the border bearing Alisigwe's photograph and the names of other individuals. Gov't Mem. at 11–12. Because the Government did not submit any evidence to support these assertions, the Court did not consider them in its analysis. *See Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir. 1995) ("[M]ere conclusory allegations or denials in legal memoranda or oral argument are not evidence[.]" (quotation omitted)). The Court did, however, consider the Government's representation that its investigation was continuing at the time of the March 1, 2021, stop.

In short, the Government has satisfied its relatively modest burden to show reasonable suspicion; the cellphone searches were, therefore, lawful. *See Levy*, 803 F.3d at 123–24 (concluding that CBP officers had reasonable suspicion to conduct a nonroutine border search given the Government's "criminal investigation" of the defendant's financial crime before he was stopped); *United States v. Kamaldoss*, No. 19-CR-543 (ARR), 2022 WL 1200776, at *11 (E.D.N.Y. Apr. 22, 2022) (concluding that the Government's ongoing investigation of the defendant and seizure of contraband in packages addressed to the defendant justified a nonroutine search of the defendant's cellphone at the border).

### B. Evidence from Alisigwe's Cellphones Was Seized in Good Faith

Even if those district courts that have held that a warrant is required to search a suspect's cellphone at the border are correct, *see United States v. Smith*, No. 22-CR-352 (JSR), 2023 WL 3358357, at *7 (S.D.N.Y. May 11, 2023); *United States v. Djibo*, 151 F. Supp. 3d 297, 309–10 (E.D.N.Y. 2015), Alisigwe's motion to suppress would, nevertheless, fail under the good faith exception.

#### 1. Legal Standard

"As both the Supreme Court and Second Circuit have held, a violation of the Fourth Amendment does not necessarily result in the application of the exclusionary rule." *United States v. Kim*, No. 16-CR-191, 2017 WL 5256753, at *3 (E.D.N.Y. Nov. 10, 2017) (citing *United States v. Rosa*, 626 F.3d 56, 64 (2d Cir. 2010); *Herring v. United States*, 555 U.S. 135, 138 (2009)); *see also United States v. Leon*, 468 U.S. 897, 906 (1984) ("Whether the exclusionary sanction is appropriately imposed in a particular case, our decisions make clear, is an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct." (internal citation omitted)).

Because the exclusionary rule exacts a heavy toll on society, it generally does not apply when suppression would provide only marginal deterrence to misconduct by law enforcement. *United States v. Raymonda*, 780 F.3d 105, 117 (2d Cir. 2015) (quoting *Herring*, 555 U.S. at 141). "The rule's corrective value justifies its cost when the police 'exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights.'" *Id.* at 117–18 (quoting *United States v. Stokes*, 733 F.3d 438, 443 (2d Cir. 2013)). With those remedial purposes in mind, the good-faith exception asks "whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances." *Herring*, 555 U.S. at 145 (cleaned up).

### 2. Application

As noted above, to date, neither the Supreme Court nor the Second Circuit has addressed the lawfulness of warrantless searches of cellphones at the border. At the time law enforcement searched Alisigwe's cellphones in February 2019 and in March 2021, those federal circuit courts that had considered the issue had concluded either that border searches of cellphones are routine and do not require even reasonable suspicion or that forensic (but not manual) border searches of cellphones require reasonable suspicion. *See Alasaad*, 988 F.3d at 17–18 (summarizing the state of the law in February 2021 and concluding that "neither a warrant nor probable cause is required for a border search of electronic devices" and that manual device searches can be conducted without reasonable suspicion).

CBP reasonably interpreted existing law in its 2018 directive, which instructs officers that "basic" searches of a traveler's electronic devices may be conducted "with or without suspicion," whereas "advanced" searches of a traveler's electronic devices require "reasonable suspicion of activity in violation of the laws enforced or administered by CBP." U.S. Customs & Border Prot., *CBP Directive Regarding Border Searches of Electronic Devices* (Jan. 4, 2018),

https://www.dhs.gov/sites/default/files/publications/CBP%20Directive%203340-049A_Border-Search-of-Electronic-Media.pdf, §§ 5.1.3–5.1.4.  The criminal laws at issue in this case are among the laws enforced by CBP.  *See Summary of Laws Enforced by CBP*, *supra* p. 8 (listing Title 18 of the U.S. Code among the laws that CBP enforces).

Given the state of the law in 2019 and 2021, the good faith exception would apply to the border searches in this case if warrants were required.  *See Smith*, 2023 WL 3358357, at *7, 13 (denying suppression of evidence obtained from a border search of the defendant's cellphone because "the breadth of the 'border search exception' was still largely in place" in March 2021); *Bongiovanni*, 2022 WL 17481884, at *13–14 (same with respect to a search conducted in April 2019).

### III. Alisigwe's Motion to Suppress Evidence Seized from His Apartment Is Denied

Alisigwe argues that law enforcement's seizure of passports from his apartment was unlawful.  In a declaration, he asserted that the agent found the passports in an opaque envelope under his bed after Alisigwe had been handcuffed and was being held in another room.  *See* Def. Mem. at 6–7; Alisigwe Decl. ¶¶ 20–21.  According to the Government, Agent McKeen seized the passports, which were in plain view on the floor, while conducting a safety sweep of Alisigwe's apartment.  *See* Gov't Mem. at 16–18.

Agent McKeen testified that he entered Alisigwe's bedroom to conduct a protective sweep.  Suppression Hearing Tr. at. 12.  After completing the sweep and concluding the room was clear of other persons, he remained in Alisigwe's bedroom while Detective Killion brought Alisigwe into the room to change his clothes.  *Id.* at 14–15.  Only 30 to 40 seconds after Alisgwe entered his bedroom to change clothes, Agent McKeen saw, in plain view, a stack of passports on the floor in the corner of Alisigwe's room.  *Id.* at 16, 19.  He saw that the top passport was

from Kenya, even though he knew Alisigwe was Nigerian. *Id.* at 16–17. Agent McKeen further testified that he never looked under the bed and had no knowledge of whether there was an envelope located there. *Id.* at 18. Detective Killion, who accompanied Alisigwe into the bedroom, was focused on getting him dressed and did not notice what Agent McKeen was doing. *Id.* at 52. Still, she corroborated the location within the room at which Agent McKeen was standing — on the opposite side of the bed from the door. *Id.* And she confirmed that she never saw any agent look under the bed or actively search for evidence during the arrest. *Id.* at 53.

The Court acknowledges Mr. Alisigwe's contradictory declaration, in which he states that a "male agent went under [his] bed and retrieved a brown envelope containing documents" and that "[o]ne could not have reached the envelope without slightly lifting the bed and reaching about as far as the arm could extend." Alisigwe Decl. ¶ 21. The Court also acknowledges and credits Detective Killion's testimony that Alisigwe raised concerns that agents were "going through [his] stuff" without a search warrant.[10] Suppression Hearing Tr. at 52. Considering that declaration and the evidence adduced at the Suppression Hearing,[11] the Court finds that Agent McKeen's version of events, which was partially corroborated by Detective Killion, is credible.

Agent McKeen's credible testimony shows that the plain view exception to the warrant requirement applies to the seizure of the passports. Agent McKeen was lawfully in Alisigwe's bedroom when he saw the stack of passports. Even though the initial protective sweep had ended, Agent McKeen was still lawfully in the bedroom and did not need to close his eyes as

---

[10] As indicated in note 11, *infra*, Alisigwe did not testify at the suppression hearing. That was, of course, his right, but it left his contemporaneous objection unexplained. The statement itself is ambiguous. It is not clear at all that Alisigwe was referring to Agent McKeen's discovery of the passports or whether he was objecting to what some other agent was doing. Even if it was a reference to Agent McKeen, it is not clear whether to Alisigwe picking up passports that are in plain sight constitutes "going through [his] stuff."

[11] Alisigwe chose to rest on his declaration and not to testify at the Suppression Hearing. Suppression Hearing Tr. at 68–69.

soon as he confirmed that the room was clear of other people. *See United States v. Hernandez*, No. 92-CR-323 (LJF), 1992 WL 251463, at *3 (S.D.N.Y. Sept. 21, 1992) (denying a motion to suppress a gun that an officer saw when, "after having finished the protective sweep, he glanced into the bathroom and saw the gun as he was walking back to the living room"). The passports were in plain view because they were stacked on the floor in the corner of the bedroom, not under the bed or in an envelope. Notwithstanding Defendant's assertion to the contrary, *see* Def. Supp. Mem., Dkt. 97 at 6, it was apparent that the passports were likely contraband because the top passport was from Kenya, even though Alisigwe is Nigerian. Together, these facts show that (1) Agent McKeen was "lawfully in a position from which [he could] view [the] object[s]," (2) the objects' "incriminating character [was] immediately apparent," and (3) he had "a lawful right of access to the object." *Dickerson*, 508 U.S. at 375. Agent McKeen, therefore, could seize the passports without a warrant pursuant to the plain view exception.

For all of these reasons, Alisigwe's motion to suppress evidence seized from his residence is denied.

### IV. Alisigwe's Motion to Suppress Evidence Intercepted from International Mail Is Denied

Alisigwe asserts that the passports that law enforcement seized from international mail addressed to him should be suppressed because they were obtained without a search warrant. *See* Def. Mem. at 8 (citing *United States v. Van Leeuwen*, 397 U.S. 249 (1970)). That argument fails because the border search exception has equal application to international mail. *See Ramsey*, 431 U.S. at 619–22.

Alisigwe's motion to suppress evidence seized from his international mail is, therefore, denied.

V.       **Alisigwe's Motion to Reconsider this Court's Ruling Precluding His Duress Defense Is Denied**

Local Criminal Rule 49.1(d) allows parties to move for reconsideration of adverse decisions.[12]  Courts may grant a motion for reconsideration upon a showing of "(1) an intervening change in controlling law; (2) the availability of new evidence; or (3) a need to correct a clear error or prevent manifest injustice." *United States v. Goldberg*, No. 12-CR-864 (LAP), 2021 WL 2444548, at *1 (S.D.N.Y. June 15, 2021) (citation omitted).  The standard for reconsideration "is not met by rearguing points the Court has already considered and rejected, nor by raising new arguments not previously presented." *United States v. Del Villar*, 20-CR-295 (VEC), 2021 WL 5180048, at *1 (S.D.N.Y. Nov. 7, 2021).

It is well established that the elements of a duress defense are: "(1) a threat of force directed at the time of the defendant's conduct; (2) a threat sufficient to induce a well-founded fear of impending death or serious bodily injury; and (3) a lack of a reasonable opportunity to escape harm other than by engaging in the illegal activity." *United States v. Gonzalez*, 407 F.3d 118, 122 (2d Cir. 2005).  As to the third element, "where there is a reasonable opportunity to escape the threatened harm, the defendant must take reasonable steps to avail himself of that opportunity, whether by flight or by seeking the intervention of the appropriate authorities." *United States v. Alicea*, 837 F.2d 103, 106 (2d Cir. 1988).  The Court held in its Duress Opinion that Alisgwe did not make any factual showing as to the third element because he wholly failed to contact U.S. law enforcement.  *See* Dkt. 52, at 7–9.  Alisigwe's arguments in his motion for

---

[12]    The rule provides that any such motion for reconsideration must be filed within 14 days of the Court's determination of the original motion.  In this case, the motion for reconsideration was filed approximately four months after the Court decided the motion; it was, therefore, untimely.  The Court, however, has exercised its discretion in this case to excuse the untimeliness and will consider the merits of the motion.  The Defendant asserts that the availability of a duress defense is crucial to his case, and, during the intervening four months, Defendant changed counsel.

reconsideration repeat the same arguments already rejected in that Opinion. The Court already considered and rejected his argument that he did not have a reasonable opportunity to escape harm because he reasonably believed Nigerian law enforcement would not help and was scared of the consequences of seeking the intervention of United States law enforcement. *See id.* at 8–9. Alisigwe does not point to controlling decisions that the Court overlooked in rejecting those arguments.

Upon Alisigwe's request at the Suppression Hearing, the Court has re-reviewed Second Circuit precedent in this area and adheres to its prior decision that, because he did not notify law enforcement in the United States about the threats to his mother despite opportunities to do so, he did not make any showing in support of the third element — that he lacked a reasonable opportunity to escape harm other than by engaging in illegal activity. There is no question that Alisigwe had multiple opportunities and many months in which he could have notified law enforcement in the United States of the threats rather than engaging in criminal conduct. At a bare minimum, Alisigwe was stopped twice on his re-entry to the United States by CBP. He easily could have explained the situation he purportedly was in during those encounters.

The Second Circuit's decision in *United States v. Bakhtiari*, 913 F.2d 1053 (2d Cir. 1990), is squarely on point. Bakhtiari claimed that unidentified Iranians threatened him and his family in Iran unless he assisted them in obtaining certain chemicals, silencers for machine funds, and hand grenades. *Id.* at 1058. He also claimed that he met with an individual at the Iranian Mission to the United Nations who showed him pictures of his father being tortured in Iran a few years earlier; that experience indicated to the defendant that the threats were not merely hypothetical. *Id.* at 1056. Similar to Alisigwe's testimony in this case, the defendant also

testified that he was told that the Iranian government would know if he went to United States law enforcement. *Id*.

The District Court assumed that Bakhtiari had "a good faith basis for believing that members of his family were threatened by persons acting for the present government of Iran." *Id.* at 1058. But he "never communicated the alleged threats to any federal, state or local law enforcement authority." *Id.* That alone made his evidence "fall[] far short of the necessary threshold showing . . . that would require a district court to permit the defense to go to a jury." *Id.*[13] The Court "decline[d] to adopt the conclusion [the defendant] implicitly urge[d] — that contacting law enforcement officials is tantamount to abandoning any hope of securing the safe return of a threatened family member. *Id.*; *see also United States v. Alicea*, 837 F.2d 103, 107 (2d Cir. 1988) (affirming preclusion of duress defense where there was "no evidence that [the defendants] made any attempt . . . to seek protection from the authorities for their families").

As recently as last week, the Second Circuit reaffirmed the *Alicea* holding that a defendant's failure to report threats to U.S. law enforcement when there is an opportunity to do so is fatal to the duress defense. In *United States v. Williams-Dorsey*, No. 22-1360-CR, 2023 WL 8015469, at *4–5 (2d Cir. Nov. 20, 2023), the defendant asserted that he traveled from Mexico to Syracuse, New York to sell drugs to protect a hostage in Mexico, who would have been killed if the defendant did not follow through with the drug transaction. *Id.* at *5. The District Court precluded the defendant from presenting the duress defense to the jury because, despite flying through multiple U.S. airports to get to Syracuse, he did not notify any U.S.

---

[13]   Later in the opinion, the Second Circuit stated that "not only did Bakhtiari completely fail to take adequate, reasonable steps to notify law enforcement officials of the alleged threats against him and his family, but he also took affirmative steps to commit additional crimes never even contemplated by the unidentified Iranians." *Bakhtiari*, 913 F.2d at 1058. The fact that Bakhtiari committed additional crimes was not a necessary fact underlying the Second Circuit's decision; instead, it appeared to be icing on the cake for why the district court correctly precluded a duress defense.

official that, unless he engaged in the drug transaction, the hostage would be killed. *Id.* The Second Circuit affirmed because the defendant "could not demonstrate that he lacked reasonable opportunity to escape the threatened harm by alerting law enforcement authorities in the United States prior to the drug transaction in Syracuse." *Id.*

The Second Circuit has consistently held over the last three and a half decades that a defendant is not entitled to present a duress defense to a jury if he did not report threats against him, his family, or others to U.S. law enforcement when there was an opportunity to do so prior to engaging in criminal conduct. *See Williams-Dorsey*, 2023 WL 8015469, at *4–6 (precluding duress defense due to defendant's failure to go to U.S. authorities); *United States v. Gonzalez*, 407 F.3d 118, 122 (2d Cir. 2005) (same); *Bakhtiari*, 913 F.2d at 1058 (same); *Alicea*, 837 F.2d at 107 (same).

Because this Court is bound by clear, on-point Second Circuit precedent, Alisigwe's motion for reconsideration is DENIED.

## CONCLUSION

For the foregoing reasons, Alisigwe's motion to suppress is DENIED. His motion for reconsideration of the Duress Opinion is also DENIED. The Clerk of Court is respectfully directed to close the open motions at Docket Entry 27 and 83.

**SO ORDERED.**

Date:  November 30, 2023       _____
New York, NY       **VALERIE CAPRONI**
    **United States District Judge**